# IN THE COURT OF APPEALS OF IOWA

No. 18-1835
Filed April 1, 2020

**SURGERY CENTER OF CEDAR RAPIDS,**
Plaintiff-Appellant,

**vs.**

**IOWA DEPARTMENT OF PUBLIC HEALTH, STATE HEALTH FACILITIES COUNCIL,**
Defendant-Appellee,

**and**

**MERCY HOSPITAL CEDAR RAPIDS d/b/a MERCY MEDICAL CENTER, and FOX EYE SURGERY, LLC,**
Intervenors,

**and**

**UNITYPOINT HEALTH CEDAR RAPIDS d/b/a ST. LUKE'S HOSPITAL,**
Intervenor-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Paul D. Scott, Judge.

Surgery Center of Cedar Rapids and intervenor UnityPoint Health Cedar Rapids appeal from the district court's ruling on judicial review affirming the Iowa Department of Health's decision to issue a certificate of need to Fox Eye Surgery, LLC. **AFFIRMED.**

Douglas E. Gross and Rebecca A. Brommel of Brown, Winick, Graves, Gross, Baskerville & Schoenebaum, P.L.C., Des Moines, for appellants.

Thomas J. Miller, Attorney General, and Heather L. Adams, Assistant Attorney General, for appellee State.

Douglas A. Fulton of Brick Gentry PC, West Des Moines, and Robert V.P. Waterman, Jr. and Michael P. Byrne of Lane & Waterman, LLP, Davenport, for intervenor Fox Eye Surgery, LLC.

Considered by Bower, C.J., and Vaitheswaran and Doyle, JJ.

**VAITHESWARAN, Judge.**

Fox Eye Surgery, LLC (Fox Eye), whose "sole corporate officer" was Dr. Lee Birchansky, filed an application for a certificate of need (CON) with the State Health Facilities Council of the Iowa Department of Health (department). *See* Iowa Code §§ 135.62(2) (2017) (establishing a council within the department "consisting of five persons appointed by the governor"), 135.63(1) (precluding the offer or development of new or changed institutional health service without application and receipt of a CON). Fox Eye asserted it wished to "re-open[] an abandoned" ambulatory surgery center "adjacent to and within the same building as Dr. Birchansky's busy ophthalmological practice." Fox Eye further asserted, "This dormant Cataract [facility] is fully equipped with Dr. Birchansky's preferred surgical equipment and could be ready to perform state-of-the-art, no-stitch cataract surgery shortly after the [department's] approval." Fox Eye submitted a $600 fee with the application, the minimum amount authorized by statute and rule. *See id.* § 135.63(1); Iowa Admin. Code r. 641–202.4(2) (same).

Three health service providers—Surgery Center of Cedar Rapids; UnityPoint Health Cedar Rapids, doing business as St. Luke's Hospital; and Mercy Hospital, doing business as Mercy Medical Center (collectively, SCCR)—resisted the application. *See* Iowa Code § 135.66(2) (requiring the department "to notify all affected persons" of an application); *see also id.* § 135.61(1)(c) (defining "affected persons" as including health facilities located in the geographical area). Following a public hearing, the department voted to grant the application.

SCCR sought rehearing, which was granted. After the rehearing, the department made additional findings and, again, granted the CON application.

SCCR filed a judicial review petition. The district court affirmed the agency decision. This appeal followed.

## I.    *Standards of Review*

SCCR challenges the "level of deference" we should afford the agency's interpretation of a provision of law. In determining the level of deference, courts are to "do all of the following":

> a. Shall not give any deference to the view of the agency with respect to whether particular matters have been vested by a provision of law in the discretion of the agency.
> b. Should not give any deference to the view of the agency with respect to particular matters that have not been vested by a provision of law in the discretion of the agency.
> c. Shall give appropriate deference to the view of the agency with respect to particular matters that have been vested by a provision of law in the discretion of the agency.

*Id.* § 17A.19(11). If the agency's interpretation of a provision of law "has not clearly been vested by a provision of law in the discretion of the agency," judicial review of the interpretation is for errors of law. *See id.* § 17A.19(10)(c). On the other hand, if the interpretation has clearly been vested by a provision of law in the discretion of the agency, judicial review of the interpretation is under the more deferential "irrational, illogical, or wholly unjustifiable" standard. *See id.* § 17A.19(10)(*l*).

SCCR argues "the provision of law at issue is an administrative rule" and courts need not "automatically" defer to the agency's interpretation of its rules. We agree deference is not automatic. But deference was warranted here. The supreme court said precisely that in *Birchansky Real Estate, L.C. v. Iowa Dep't of Public Health*, 737 N.W.2d 134, 138 (Iowa 2007). The court stated "the interpretation of the statutory exemption for a CON, Iowa Code § 135.63(2)(o), was

clearly vested in the discretion of the Department." *Birchansky Real Estate, L.C.*, 737 N.W.2d at 138.

This court said the same thing in *UnityPoint Health Cedar Rapids v. Iowa Dep't of Public Health*, No. 17-1317, 2019 WL 141006, at *2–4 (Iowa Ct. App. Jan. 9, 2019). Considering the department's interpretation of a rule, we stated:

> St. Luke's maintains the district court erred when it utilized the "highly deferential 'irrational, illogical, or wholly unjustifiable' standard" in reviewing the Council's interpretation.
> . . . .
> The Council has been given both broad powers and specific duties regarding CONs. . . .
> We agree with the district court the Council had been clearly vested with the power to interpret rule 641–203.2(3)(a)(1). In reaching this conclusion, we note that we have reached the same conclusion before. *See Fox Eye Surgery, L.L.C. v. Iowa Dep't of Pub. Health*, No. 09-1679, 2010 WL 3324944, at *1 (Iowa Ct. App. Aug. 25, 2010) ("Because the council's review of CON applications is a matter vested within its discretion, we only reverse if the council's decision to deny the application was 'irrational, illogical, or wholly unjustifiable.'").

*UnityPoint Health Cedar Rapids*, 2019 WL 141006, at *2–4 (internal citations omitted). *UnityPoint* serves as persuasive authority on the deference question. We conclude the interpretation in this case was clearly vested in the discretion of the department. We will reverse only if the agency interpretation was "irrational, illogical, or wholly unjustifiable." Iowa Code § 17A.19(10)(*l*).

SCCR also contends certain fact findings made by the department are not supported by substantial evidence. The standard bears some discussion in this context.

Iowa Code section 135.66(3)(b) authorizes a "public hearing" on a CON application. The hearing is not a "contested case," as that term is defined in the Iowa Administrative Procedure Act (IAPA). *See id.* § 17A.2(5) (defining

"[c]ontested case" as "a proceeding including but not restricted to ratemaking, price fixing, and licensing in which the legal rights, duties or privileges of a party are required by Constitution or statute to be determined by an agency after an opportunity for an evidentiary hearing"); *Greenwood Manor v. Iowa Dep't of Pub. Health*, 641 N.W.2d 823, 834 (Iowa 2002) ("We conclude the evaluation of an application for a certificate of need by the Council does not implicate the contested case procedures.").

Under a prior version of the IAPA, the substantial evidence standard of review did not apply to hearings that were not contested cases. *See* Iowa Code § 17A.19(8)(f) (1997) (setting forth judicial review standard as, "*In a contested case*, unsupported by substantial evidence in the record made before the agency when that record is viewed as a whole" (emphasis added)); *Greenwood*, 641 N.W.2d at 831 ("Because we find the proceeding in this case did not involve a contested case, we do not consider whether the decision was supported by substantial evidence under section 17A.19(8)(f)."). A 1998 amendment removed the reference to "contested case." *See* 1998 Iowa Acts ch. 1202, § 23 (codified at Iowa Code § 17A.19(10)(f)). The standard now applies to any "determination of fact clearly vested by a provision of law in the discretion of the agency." Iowa Code § 17A.19(10)(f). The determination of fact may be made in proceedings other than contested cases. *See* Arthur E. Bonfield, *Amendments to Iowa Administrative Procedure Act, Report on Selected Provisions to Iowa State Bar Association and Iowa State Government* 68 (1998) ("Paragraph (f) now also applies the substantial evidence test to all ultimate facts found by an agency, as well as to all basic facts underlying those ultimate facts, pursuant to a clear delegation of authority to the

agency to do so, whether those facts are found in formal adjudication and, therefore, were subject to the 'substantial evidence' test under the original IAPA, or in informal adjudication or rulemaking which were subject to the 'unreasonable, arbitrary, capricious, or abuse of discretion' test under the original IAPA.").

We have no trouble concluding that determinations of fact made by the department in this case were clearly vested by a provision of law in the discretion of the department. *See* Iowa Code § 135.64 (setting forth criteria for evaluation of CON applications). Accordingly, we will review the department's fact findings under the substantial evidence standard.

## II. *Whether CON Application was Incomplete*

SCCR argues Fox Eye's CON application was incomplete. In its view, (1) "Fox Eye failed to provide clear, consistent, reliable or adequate information regarding expenditures to update the building"; (2) "Fox Eye failed to provide clear, consistent, reliable or adequate information regarding equipment-related expenditures"; (3) "Fox Eye failed to provide clear, consistent, reliable or adequate information regarding its lease costs"; and (4) "Fox Eye's failure to include the total costs of its project is fatal to its Application." SCCR relies on a departmental rule identifying the required contents of an application and the required fee. *See* Iowa Admin. Code r. 641–202.4. It asserts the department interpreted the rule incorrectly.

The law on completion of CON applications is as follows. An application "shall be made upon forms furnished or prescribed by the department and shall contain such information as the department may require." Iowa Code § 135.63(1). "Within fifteen business days after receipt of an application for a certificate of need,

the department shall examine the application for form and completeness and accept or reject it." Iowa Code § 135.66(1); *see also* Iowa Admin. Code r. 641–202.4(3)(a) ("The department shall send written notice to the applicant within 15 business days of receipt of the application if the application has been accepted as complete or otherwise state in said notice what information is needed to make the application complete."). "An application shall be rejected only if it fails to provide all information required by the department pursuant to section 135.63, subsection 1." Iowa Code § 135.66(1). "An application shall be deemed 'accepted' once the department has determined it to be complete and the fees defined in 202.4(2) 'a' are paid in full." Iowa Admin. Code r. 641–202.4(3)(b).

Fox Eye's CON application included the following question on costs: "What will be the source of capital funds? Attach a description of asterisked items." Fox Eye responded as follows:

|  | **Estimated Amount** |
| --- | --- |
| **Cash on Hand** | $10,000 |
| **Borrowing*** | 0 |
| **Federal Funds*** | 0 |
| **State Funds*** | 0 |
| **Gifts/Contributions*** | 0 |
| **Lease*** | 0 |
| **Other (specify)** | 0 |
| **TOTAL** | $10,000 |

Fox Eye stated, "There are no borrowed funds," and attached a copy of a proposed lease, which specified the rent was $3000 per month.

On receipt of the application, the department asked Dr. Birchansky to answer certain questions, including how the cash on hand identified in the application would "be spent." Dr. Birchansky responded, "Cash on hand is a buffer

earmarked for paying any operating expenses due prior to receiving cash flow from operations."

At the original hearing, one of the council members suggested $10,000 to get the facility "up and going again . . . seem[ed] low." Birchansky responded, "It may be high; it may be low." He acknowledged recently learning of safety code changes that would have to be addressed.

In closing arguments, counsel for one of the resisters cited the dearth of cost information in the application and questioned "whether or not the application is even complete in terms of reflecting what the intention of the party might be." SCCR followed up with a request for rehearing. As noted, the department granted the request.

On rehearing, Fox Eye submitted supplemental cost information. Based on that information, the department made findings of fact relating to the project's costs, as follows:

> 20. Fox Eye Surgery engaged an architect and engineer who provided a cost breakdown and who reached out to the Department of Inspections and Appeals and the State Fire Marshal's office to discuss compliance with current life safety codes and the costs associated with retrofitting the current space to meet these codes. Fox Eye Surgery noted that upon CON approval, it will have the life and safety inspection performed by an accreditation agency with Medicare deemed status. If additional modifications are indicated then the surgery center will be brought into compliance and compliance will be verified before opening to the public.
> . . . .
> 24. According to the architect retained by Fox Eye after the original hearing in July, Wells + Associates PC, the facility would need some construction updates ($9900), and modifications of the HVAC ($33,220), plumbing and electrical systems ($9300) to bring it up to current code. Additionally there would be architecture and engineering fees as well as construction management and commissioning fees ($4160), and a project contingency of $20,000, for a total projected cost of $88,220.

. . . .

39. Costs for the project are anticipated to be $66,220, with a contingency of $20,000 for a total cost of $88,220. These costs, unlike those offered by the applicant at the July hearing, are based upon input from an experienced and registered architect and actual bids for the various component costs. The project will be paid with savings from Birchansky Real Estate LLC.

It is clear from these findings that the department deemed the application complete after Dr. Birchansky provided the supplemental cost information and the agency implicitly rejected SCCR's assertion that the application was incomplete.

The department's action was authorized by rule. *See* Iowa Admin. Code r. 641–202.4(3)(a).[1] After the department determined Fox Eye's application was incomplete or only technically complete, the department sought clarifying information. And when SCCR expressed continuing skepticism about Fox Eye's cost figures, the department scheduled another hearing to address the concern. We are persuaded the department satisfied its statutory mandate to obtain information about the cost of the project.

In reaching this conclusion, we have considered SCCR's argument that Fox Eye provided scant evidence of equipment-related costs. Dr. Birchansky addressed the issue by explaining his intent to use existing equipment at the facility. He presented evidence that the equipment was not obsolete. The department credited his evidence, finding that "the equipment he uses is still in use today" and "when maintained properly can provide very safe and effective service." Substantial evidence supports the department's finding.

---

[1] SCCR does not challenge rule 641–202.4(3)(a) as ultra vires to the extent it authorizes the department to request additional information to make the application complete.

As for the lease costs, SCCR acknowledges they were included in the application but faults Fox Eye for "fail[ing] to include [them] in its project costs for the rehearing." Because Fox Eye attached the lease to its application, we are not persuaded that the failure to also include rental fees in the total projected costs rendered the application incomplete.

We are left with SCCR's argument that the department failed to charge Fox Eye an application fee commensurate with its overall cost. Iowa Code section 135.63(1) states the application "shall be accompanied by a fee equivalent to three-tenths of one percent of the anticipated cost of the project with a minimum fee of six hundred dollars and a maximum fee of twenty-one thousand dollars." "The fee shall be based on the total cost of the project, which shall include site costs, land improvements, facility costs, movable equipment and financing costs." Iowa Admin. Code r. 641–202.4(2)(a). The department found the total cost of the project to be $88,220. Substantial evidence supports the finding. Fox Eye's fee of $600 satisfied the rule's prescription.

We conclude the department did not act illogically, irrationally, or without justification in interpreting the department's rule to permit acceptance of the application following receipt of the supplemental cost information and in implicitly finding Fox Eye's application complete at the conclusion of rehearing in the matter.

### III. Substantial Evidence to Support Approval of CON

We turn to the merits of the department's decision approving the CON application. In determining whether to issue a CON, the department is to consider the criteria listed in Iowa Code section 135.64(1), paragraphs (a) through (r) and must make four findings:

     a. Less costly, more efficient, or more appropriate alternatives to the proposed institutional health service are not available and the development of such alternatives is not practicable;

     b. Any existing facilities providing institutional health services similar to those proposed are being used in an appropriate and efficient manner;

     c. In the case of new construction, alternatives including but not limited to modernization or sharing arrangements have been considered and have been implemented to the maximum extent practicable;

     d. Patients will experience serious problems in obtaining care of the type which will be furnished by the proposed new institutional health service or changed institutional health service, in the absence of that proposed new service.

Iowa Code § 135.64(2)(a)–(d). The parties agreed subsection (c) regarding new construction was not at issue.

The department made several pertinent findings on the remaining three provisions. The department cited Dr. Birchansky's statement that "surgery times (mornings and Saturdays) which are most beneficial to its patients are not available at the hospitals or the SCCR" as well as SCCR's countervailing assertion that "the operating room capacity" at its facilities "can accommodate the procedures that are proposed to be performed at the Fox Eye location." The department found a competitor—Wolfe Eye Clinic—partnered with resister Mercy Medical Center, which in turn "moved its cataract surgery services to a new medical park . . . roughly two miles from the Fox Eye Surgery location." Based on these and other findings, the department made the following determinations:

     1. The Council concludes that less costly, more efficient or more appropriate alternatives to the proposed health service are not available and the development of such alternatives is not practicable. Dr. Birchansky has experienced difficulties in scheduling his patients for cataract surgeries at the alternative facilities in the service area, and those difficulties will be exacerbated with the opening of Mercy Medical Center's new outpatient surgical facility. Additionally, to require that Dr. Birchansky continue to

perform surgeries [at] a facility which is so publicly affiliated with another ophthalmology group is not an appropriate alternative, especially in light of his existing, but currently dormant, [facility].

2. The Council concludes that existing facilities providing health services similar to those proposed are and will continue to be used in an appropriate and efficient manner and will not be impacted by this project. The Council takes note that collectively Mercy and SCCR perform 47,500 surgeries per year; the small percentage of these surgeries which originate from Fox Eye will have minimal impact on these facilities. Additionally, the Council notes that a portion of Fox Eye Surgery patients will continue to choose SCCR for their cataract surgery which will further minimize the impact on that facility. The Council further finds that both Mercy and SCCR have undergone significant expansions within the past several years which indicate their facilities are being utilized at an efficient level, and their continued investment in and expansion of outpatient surgery rooms indicates past and expected future rates of high utilization. Finally, Dr. Birchansky will continue to see patients and perform surgeries in the rural locations he currently services, further minimizing the impact on those facilities.

. . . .

4. The Council concludes that patients will experience serious problems in obtaining care of the type which will be furnished by the proposed new institutional health service, in the absence of that proposed service. The Council finds that the applicant has had difficulties in scheduling time for surgeries for his patients at existing facilities and that those difficulties will increase given the ownership structure of existing facilities. The Council concludes that cataract surgery patients are primarily the elderly—many of whom are handicapped, ambulate with difficulty and have poor hearing and eyesight. The Council concludes that these patients would benefit from having surgery done in a single story facility in the same location as [Dr. Birchansky's ophthalmological practice] and that they would also benefit from having the option of morning and Saturday surgery times, which may not be available at other locations.

(Internal citations omitted.) The record contains evidence supporting the department's findings.

Dr. Birchansky stated the times he was assigned at SCCR and Mercy were "not convenient for patients or family members." In his words, his "patients had no choice but to be moved like pawns to [SCCR's] facilities" for "[t]his six-minute procedure." He further stated:

> This has a direct impact on my residual schedule at my Cedar Rapids office because I need to see patients as well. It's not just all about surgery. And it affects each and every outreach location I serve. So it would mean that I would delay getting—I would delay patients from—it would delay patients from receiving eye care as I would not be able to efficiently schedule office consultations if I can't have the allotted office time to see them.
>
> In simple terms, if I'm not in the office caring for patients, I will have no surgical patients to schedule.

And he said, "[When] I'm using my preferred equipment[,] it makes me very efficient." The time savings, in his view, would allow him to devote more time to reviving rural hospitals, as he had done in the past.

An employee who administered anesthesia for Dr. Birchansky stated the patients were typically "elderly" and "the convenience at his place, it's like . . . going to a house. One level, you know the people."

A fellow physician referred to the "fiercely competitive ophthalmology groups in Cedar Rapids." He stated Mercy was "associated with Wolfe Eye Clinic, and they . . . just opened a brand new facility . . . and you go there and you see Wolfe Eye Clinic, a big sign, right across their front door." He also noted St. Luke's was "closely aligned with Iowa Eye Center ophthalmologists." With respect to scheduling surgeries he stated, "The premier blocks, those in the mornings, are given to those surgeons that have either ownership or other significant interests in the hospital, leaving us independent surgeons only available to schedule limited times." He also spoke to the expansion of operating facilities by the Surgery Center and Mercy and suggested they did not come to the table with clean hands.

Although this evidence supports the department's findings, we are statutorily obligated to view "the record as a whole." Iowa Code § 17A.19(10)(f).

"When that record is viewed as a whole" means that the adequacy of the evidence in the record before the court to support a particular finding of fact must be judged in light of all the relevant evidence in the record cited by any party that detracts from that finding as well as all of the relevant evidence in the record cited by any party that supports it, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witnesses and the agency's explanation of why the relevant evidence in the record supports its material findings of fact.

*Id.* § 17A.19(10)(f)(3). The record contains evidence detracting from the department's findings.

Mercy's chief financial officer stated that although Wolfe Eye Clinic had an ownership interest in its new center, Fox Eye Clinic was offered an ownership interest as well and "elected to not pursue" that interest. In his view, "effective use of these existing facilities show that there would be no need for additional operating room capacity in Cedar Rapids."

A nurse manager with Mercy stated Mercy had "16 fully equipped [operating room] suites" with "[t]wo" of them "located on the first floor of the hospital." She pointed out that Dr. Birchansky "requested [operating room ("OR")] time for his patients on every other Tuesday beginning at 9:00 A.M." and "[a]dditional OR time in eye OR suites [was] offered" but Dr. Birchansky did "not accept[] those offers." She also noted that OR suites were available all day on Fridays "except for the fourth Friday of the month." She opined there was "no need for additional operating room capacity in Cedar Rapids."

The chief operating officer of UnityPoint similarly testified "there remain[ed] high quality alternatives for cataract surgery in Cedar Rapids." She noted the "topic here" was "one of need" rather than "convenience in services" and there was "excess surgical capacity in the community already."

The executive director of the Surgery Center testified Dr. Birchansky "already perform[ed] two-thirds of his proposed procedures at the Surgery Center" and the Surgery Center "offered him additional time, both on his day of surgery and . . . blocks of time throughout the week." He stated that even if the Surgery Center "accommodated all 645 procedures that Dr. Birchansky proposed . . . that would still only represent 7 percent of" its capacity.

Finally, an ophthalmologist with the Iowa Eye Center stated the Surgery Center had "state-of-the-art" equipment, and he said he and his colleagues had "not encountered any difficulties scheduling patients for surgery" at the other facilities. He acknowledged he and three of his colleagues were "owners in the Surgery Center of Cedar Rapids."

Although the cited evidence may detract from the department's findings, the supreme court has exhorted courts "not to determine whether the evidence supports a different finding" but "to determine whether substantial evidence . . . supports the findings actually made." *Abbas v. Iowa Ins. Div.*, 893 N.W.2d 879, 891 (Iowa 2017) (quoting *Mike Brooks, Inc. v. House*, 843 N.W.2d 885, 889 (Iowa 2014)). The record contains substantial evidence to support the findings actually made. To the extent SCCR challenges the department's application of law to fact, we conclude its application is not "irrational, illogical, or wholly unjustifiable." *See* Iowa Code § 17A.10(m) (authorizing relief "[b]ased upon an irrational, illogical, or wholly unjustifiable application of law to fact that has clearly been vested by a provision of law in the discretion of the agency").

*IV.*     ***Consistency with Prior Decisions***

We are left with SCCR's contention that the department did not "sufficiently distinguish[] its decision from [its] prior denials." SCCR points to the department's four prior denials of Fox Eye/Birchansky CON applications and argues, "While changes have certainly occurred in the last ten years in the Cedar Rapids medical community, none of these changes provide a credible basis for the [department's] inconsistent action in granting a CON to Fox Eye."

We are to reverse agency action that is "inconsistent with the agency's prior practice or precedents, *unless the agency has justified that inconsistency by stating credible reasons sufficient to indicate a fair and rational basis for the inconsistency*." Iowa Code § 17A.19(10)(h) (emphasis added); *see also Office of Consumer Advocate v. Iowa Utils. Bd.*, 770 N.W.2d 334, 341–42 (Iowa 2009); *cf. Finch v. Schneider Specialized Carriers, Inc.*, 700 N.W.2d 328, 332–33 (Iowa 2005) ("We do not believe that Iowa Code section 17A.19(10)(h) establishes an independent requirement that the commissioner identify other agency rulings and explain possible inconsistencies between those rulings and the agency's decision in a case not reviewable under an abuse-of-discretion standard."). The department explained the inconsistency as follows:

> Significant changes in the existing health care system, and specifically in the outpatient surgery health care market, have occurred in Cedar Rapids in the decade since the [department] denied Dr. Birchansky's former applications. At the time of the prior denials, the facilities which provided outpatient surgery offered independent providers like Dr. Birchansky the opportunity to perform cataract surgeries at their locations on equal footing with physicians aligned with ophthalmology groups in Cedar Rapids. Currently, the existing facilities offering outpatient cataract surgery have more closely aligned with competitors to Dr. Birchansky. Specifically, Mercy has partnered with the Wolfe Eye Clinic in the development of

the Hiawatha [facility] and patients receiving cataract surgery at that location could clearly infer that they are being treated by Wolfe Eye-affiliated physicians. Additionally, both existing outpatient cataract surgery providers have made substantial investments in and undertaken expansions of their outpatient surgical facilities since the dates of the prior denials of Dr. Birchansky's applications.

Because the department justified the inconsistency, we discern no basis for reversal on this ground.

Like the district court, we affirm the department's approval of Fox Eye's CON application.

**AFFIRMED.**